UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

FILED
97 SEP 22 PM 2:48
U.S. DISTRICT COURT
N.D. OF ALABAMA

AGAYIA KENNEDY )
 )
    Plaintiff, )
 )
vs. ) Civil Action No. CV-97-S-1552-NE
 )
BUD'S CONVENIENCE STORE, )
INC. and CHARLES PUCKETT, )
 )
    Defendants. )
 )

ENTERED
SEP 2 2 1997

## MEMORANDUM OPINION

This action is before the court on defendants' motion to compel arbitration and stay this proceeding. Upon consideration of the motions, pleadings, briefs, evidentiary admissions, and oral argument of counsel, this court concludes that defendants' motions are due to be held in abeyance pending further discovery and briefing by the parties.

### I.  STATEMENT OF CASE

Beginning on an unspecified date during July of 1994, plaintiff worked for two years as a cashier in two "Bud's Convenience Stores"[1] ("Bud's") located in Ardmore and Decatur, Alabama. (Complaint ¶ 9.) Plaintiff alleges that defendant Charles Puckett ("Puckett"), a store operations manager,[2] "touched

---

[1] The motion and its attached affidavit assert there is no entity known as "Bud's Convenience Store, Inc.," but that Petroleum Sales, Inc., an Alabama corporation, owns and operates a number of convenience stores which conduct business under the trade name of "Bud's Convenience Store."

[2] Plaintiff does not allege which of the two stores (Ardmore or Decatur) Puckett served as "store operations manager." During oral argument, however, counsel for defendants represented that Puckett served as a "roving supervisor."

and fondled ... her buttocks, legs, and breast" on repeated occasions in a "rude and offensive manner." (*Id.* ¶ 10.) She also asserts that Puckett made sexually explicit remarks on repeated occasions, and told her that he could improve her working conditions if she "would not resist his sexual advances and were to engage in sexual acts with him." (*Id.* ¶ 11.) Plaintiff alleges she told Puckett that his sexual touching, comments, and requests were unwelcome and should stop, but he persisted, even to the point of exposing his penis. (*Id.* ¶ 12.)

Plaintiff contends that Bud's had no procedure for reporting Puckett's conduct to higher management. (*Id.* ¶ 14.) The president and chief executive officer of the corporate entity which owns and operates Bud's,[3] J. Stratton Orr ("Orr"), insists, however, that a grievance procedure <u>was</u> in place at the time of plaintiff's employment. (Orr Affidavit at 2; see Orr Affidavit Exhibit 5.) Orr avers that, on July 26, 1994, plaintiff signed an application for employment, the last paragraph of which states:

> I agree, by completing this application and seeking further employment consideration that all controversies/ grievances/charges which may arise from the employment relationship shall be determined by binding arbitration. I accept arbitration as the sole and exclusive grievance remedy including charges resulting from the Age Discrimination In Employment Act. I agree to waive all other action pending completion of binding arbitration.

(Orr Affidavit Exhibit 1 at 2.) Orr asserts that, once plaintiff was hired, she was given (and required to read) a copy of Bud's employee policy manual, containing an explanation of the company's

---

[3] See note 1 *supra*.

2

grievance procedures. (Orr Affidavit at 2; see Orr Affidavit Exhibits 4 and 5.)

The grievance section of Bud's employee policy manual outlines a multi-level structure for handling employee complaints, beginning with complaints to the manager, then to the operations manager, and finally to the president (or a designated representative). (Orr Affidavit Exhibit 5.) If the grievance is not satisfactorily resolved after exhausting all steps of that progression, the employee may request binding arbitration. (Id.)

There is no record of plaintiff complaining to anyone at Bud's regarding Puckett's conduct during the period of her employment, however. (Orr Affidavit at 2.) Rather, she simply resigned on August 22, 1996. (Id. at 2.) Plaintiff now claims she was constructively discharged as the result of intolerable sexual harassment,[4] assault and battery, and negligent supervision. (Complaint ¶¶ 16-29.)

## II. DISCUSSION

Defendants move the court to stay this proceeding, and to compel arbitration pursuant to the arbitration agreement signed by plaintiff and the grievance procedures set out in the company's employee manual. Given the inadequately developed record, however, defendants' motion is premature, and due to be held in abeyance

---

[4] Plaintiff's sexual harassment claim arises under Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991 (42 U.S.C. §§ 2000e et seq.).

3

pending completion of additional discovery and the briefing described herein.[5]

This court finds that the case *sub judice* calls for application of the principles set out in *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24, 111 S. Ct. 1647, 1651, 114 L. Ed. 2d 26 (1991), and *Bender v. A.G. Edwards & Sons, Inc.*, 971 F.2d 698 (11th Cir. 1992). The record currently before the court, however, is inadequate for immediate resolution. Moreover, several questions relevant to the present case remain open after *Gilmer* and *Bender*.

First, because the Supreme Court did not address the impact of the Civil Rights Act of 1991 on the enforceability of arbitration agreements, it is unclear whether Congress intended to bar the waiver of a judicial forum for Title VII claims. *See* Pub. L. 102-166, 105 Stat. 1071 (codified in scattered sections of 42 U.S.C.). Congressional intent may be revealed either in the text of the Act or accompanying legislative history. *Gilmer*, 500 U.S. at 26, 111 S. Ct. at 1652. Because neither the Supreme Court nor the Eleventh Circuit have directly considered the impact of the Civil Rights Act of 1991 on arbitration agreements in the Title VII context, this issue merits further consideration.

Second, the *Gilmer* Court noted that congressional intent may also be revealed by "an inherent conflict between arbitration and

---

[5] Although the concerns raised by this court regarding arbitration apply primarily to plaintiff's Title VII claims, defendant's motions as to the state law claims will also be deferred pending further development of the record. In the event the plaintiff's claims are ultimately arbitrated, expense will be minimized for both parties if all claims proceed to arbitration together.

4

the [federal civil rights statute's] underlying purposes." *Id.* The Supreme Court found no such conflict on the facts of *Gilmer*. *Gilmer*, however, involved the Age Discrimination in Employment Act of 1967[6] ("ADEA") and an arbitration procedure governed by the well-defined rules of the New York Stock Exchange. *Id.* at 23, 111 S. Ct. at 1650. Here, the claim arises under Title VII, and the record is silent regarding the procedures to be used in arbitration. Although the Supreme Court dismissed Gilmer's challenges to the adequacy of the NYSE's arbitration procedures, the adequacy of the procedures proposed to be used in the present case, once ascertained, must be similarly tested for consistency with the underlying purposes of Title VII.

Third, § 1 of the Federal Arbitration Act[7] states that "nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." A broad reading of that language would exclude from the FAA all employment contracts that affect commerce. Some courts, however, have held that § 1 only applies to workers actually engaged in the transportation of goods in interstate commerce. *See, e.g., Cole v. Burns International Security Services*, 105 F.3d 1465, 1471 (D.C. Cir. 1997) (citing cases). Neither the Eleventh Circuit nor the Supreme Court has addressed the interpretation of § 1.

---

[6] 81 Stat. 602, as amended, 29 U.S.C. §§ 621 *et seq.*

[7] 9 U.S.C. § 1.

5

These issues are properly illuminated by a brief review of the Federal Arbitration Act and its increasing acceptance by federal courts.

### A.  Development of Federal Arbitration Law

The FAA was originally enacted in 1925 and reenacted in 1947 as Title 9 of the United States Code. Its key substantive section states that:

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. Its purpose was "to reverse the longstanding judicial hostility to arbitration agreements..., and to place arbitration agreements upon the same footing as other contracts." *Gilmer*, 500 U.S. at 24, 111 S. Ct. at 1651 (citing *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 219-20 and n.6, 105 S. Ct. 1238, 1241-42 and n.6, 84 L. Ed. 2d 158 (1985)). Federal district courts have the power, under the FAA, to stay court proceedings pending resolution of an issue in arbitration, and to compel arbitration when parties fail to comply with a valid arbitration agreement. 9 U.S.C. §§ 3-4. Those provisions embody the "liberal federal policy favoring arbitration agreements." *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24, 103 S. Ct. 927, 941, 74 L. Ed. 2d 765 (1983).

The first task of a district court asked to compel arbitration is to determine whether the parties entered a valid arbitration

6

agreement. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626, 105 S. Ct. 3346, 3353, 87 L. Ed. 2d 444 (1985). This approach is set out in the FAA:

> The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement.

9 U.S.C. § 4. Next, the court must determine whether the arbitration agreement is enforceable with regard to all of plaintiff's claims.

**B. Congressional Intent Regarding Waivers of a Judicial Forum for Title VII Claims**

With regard to plaintiff's Title VII claim, defendants rely on *Bender v. A.G. Edwards & Sons, Inc.*[8] for the proposition that such claims may be submitted to arbitration. In *Bender*, the Eleventh Circuit held that private contractual agreements to arbitrate employment-based disputes — including Title VII claims — are enforceable. *Bender*, 971 F.2d at 700. The Eleventh Circuit relied primarily on the Supreme Court's decision in *Gilmer v. Interstate/Johnson Lane Corp.*[9] for its holding. Thus, the Eleventh Circuit, addressing an arbitration agreement identical to the one in *Gilmer*,[10] merely noted the similarity between the ADEA and Title VII, and extended the *Gilmer* rule to Title VII claims. *See Bender*,

---

[8] 971 F.2d 698 (11th Cir. 1992).

[9] 500 U.S. 20, 24, 111 S. Ct. 1647, 1651, 114 L. Ed. 2d 26 (1991).

[10] The arbitration agreement at issue in both cases was the Uniform Application for Securities Industry Registration ("U-4").

7

971 F.2d at 700 (stating "[w]e see no reason to distinguish between ADEA claims and Title VII claims").

The Civil Rights Act of 1991, however, was enacted six months <u>after</u> the Supreme Court's decision in *Gilmer*, so the provisions of the Act were not considered by the Court in its rejection of Gilmer's claims. The Act states: "[w]here appropriate and to the extent authorized by law ... arbitration ... is encouraged to resolve disputes arising under these laws." Pub. L. No. 102-166, § 118, 105 Stat. 1071, 1081 (*see* notes following 42 U.S.C. § 2000e). The Act also granted the right to a trial by jury in Title VII actions. 42 U.S.C. § 1981a(b), (c).

In *Gilmer*, the Supreme Court stated: "[I]f Congress intended the substantive protection afforded by a given statute to include protection against waiver of the right to a judicial forum, that intention will be deducible from text or legislative history." *Gilmer*, 500 U.S. at 29, 111 S. Ct. at 1654 (quoting *Mitsubishi Motors Corp.*, 473 U.S. at 628, 105 S. Ct. at 3354). Yet, in *Bender*, the Eleventh Circuit did not conduct an analysis of congressional intent with regard to Title VII as required by *Gilmer*. Indeed, the Eleventh Circuit made no mention of the 1991 amendments to Title VII, presumably because those amendments were not retroactive and, thus, inapplicable to *Bender*. *See Cross v. Alabama*, 49 F.3d 1490, 1508 (11th Cir. 1995) (noting non-retroactivity of Title VII). Therefore, even if the Eleventh Circuit had analyzed congressional intent as of the time Bender

8

signed his U-4, a second analysis would be mandated in the present case to determine if that intent changed with the 1991 amendments.

Accordingly, this court finds that, notwithstanding *Bender*, a determination of congressional intent with regard to the Civil Rights Act of 1991 is appropriate in the present case. The parties are directed to review this court's opinion in *Eye v. Prudential Securities, Inc.*, et al., CV-97-S-337-NE, filed this date and incorporated herein by reference, and to submit briefs on the issues raised therein regarding the impact of the Civil Rights Act of 1991 on the *Gilmer* holding.

## C. Inherent Conflict Between Arbitration Procedures and Statutory Rights Under Title VII

The Supreme Court has stressed that, "[s]o long as the prospective litigant effectively may vindicate [her] statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function." *Mitsubishi Motors Corp.*, 473 U.S. at 637, 105 S. Ct. at 3359. In *Gilmer*, the Supreme Court considered whether an ADEA claim could be effectively vindicated *via* the arbitration procedures of the New York Stock Exchange.

The plaintiff in *Gilmer* challenged the adequacy of arbitration to effectuate the underlying purpose of the ADEA. *Gilmer*, 500 U.S. at 30, 111 S. Ct. at 1654. He claimed arbitration was subject to arbitrators' bias, placed burdensome limitations on discovery, did not require written opinions which could easily be reviewed, did not permit equitable relief or class actions, and ignored the problem of unequal bargaining power between employers and

9

employees. *Id.* at 30-33, 111 S. Ct. at 1654-56. The Supreme Court rejected each of those challenges. First, the Court noted that:

> generalized attacks on arbitration 'res[t] on suspicion of arbitration as a method of weakening the protections afforded in the substantive law to would-be complaints,' and as such, they are 'far out of step with our current strong endorsement of the federal statutes favoring this method of resolving disputes.'

*Id.* at 30, 111 S. Ct. at 1654 (quoting *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 481, 109 S. Ct. 1917, 1920, 104 L. Ed. 2d 526, ___ (1989)).

Moreover, on review of the New York Stock Exchange ("NYSE") arbitration procedures which would be used in Gilmer's case, the Court found that each of Gilmer's concerns was appropriately remedied by the NYSE rules. *Id.* at 30-33, 111 S. Ct. at 1654-56 (finding that the NYSE rules provided protections against bias; permitted adequate discovery in the form of depositions, document production, information requests, and subpoenas; required written opinions; and did not bar equitable relief). Although the procedural rules of arbitration might be less extensive than those in federal courts, the Court said that an agreement to arbitrate "trades the procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration." *Id.* at 31, 111 S. Ct. at 1655 (quoting *Mitsubishi Motors Corp.*, 473 U.S. at 628, 105 S. Ct. at 3354). The Court also noted that "an important counterweight to the reduced discovery in NYSE arbitration is that arbitrators are not bound by the rules of evidence." *Id.*

10

The broad underlying purpose of Title VII is "to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of ... employees over other employees." *Griggs v. Duke Power Co.*, 401 U.S. 424, 429-430, 91 S. Ct. 849, 853, 28 L. Ed. 2d 158 (1971). Accordingly, this court must determine whether the specific arbitral forum provided for in the present case will permit effective vindication of plaintiff's Title VII rights, keeping in mind the remedial and compensatory purposes of the statute.

*Gilmer* establishes the effectiveness of the arbitral procedures adopted by the NYSE in vindicating the substantive rights protected by the ADEA. The Eleventh Circuit's decision in *Bender v. A.G. Edwards & Sons, Inc.* extended *Gilmer* to include Title VII claims. *Bender*, like *Gilmer*, involved arbitration conducted under articulated rules set by the securities industry. In the case at bar, the arbitral procedures which will be used to vindicate the plaintiff's Title VII rights are not evident from the current record. They may, or may not, be similar to those used in *Gilmer* and *Bender*. Accordingly, the fact-intensive analysis demanded by *Gilmer* requires additional discovery as to the arbitration procedures called for in this case.

Accordingly, the parties are directed to pursue discovery to ascertain the specific procedural rules governing the proposed arbitration in this case, including such issues as the following:

11

who will pay for the arbitrator;[11] how many arbitrators will be used; how is (are) the arbitrator(s) to be selected; what qualifications shall the arbitrator(s) possess; what rules will apply to discovery, evidentiary, and procedural issues; will a written opinion be issued; is there an ongoing relationship between the employer and the arbitrator; what issues are to be decided by the arbitrator; and all other such specifics as will be useful to this court's analysis of the adequacy of the procedures. In addition, the parties are directed to submit briefs addressing the adequacy of those procedures to vindicate the plaintiff's substantive rights as embodied in Title VII.

D.  **Interpretation of the Exclusionary Clause in § 1 of the FAA**[12]

The scope of § 1 of the FAA has not been determined by either the Supreme Court or the Eleventh Circuit. In *Gilmer*, the issue was raised, but not decided, because the Court found that the arbitration agreement at issue in that case was not part of a contract for employment.[13] *Gilmer*, 500 U.S. at 25 n.2, 111 S. Ct. at 1651 n.2.

The issue was decided recently by the Court of Appeals for the District of Columbia in *Cole v. Burns International Security Services*, 105 F.3d 1465 (D.C. Cir. 1997). In *Cole*, the court held

---

[11] The parties are directed to the discussion of this issue in *Cole v. Burns Int'l Sec. Servs.*, 105 F.3d 1465 (D.C. Cir. 1997).

[12] This issue applies equally to plaintiff's Title VII and state law claims.

[13] Similarly, the arbitration agreement in this case is contained in plaintiff's application for employment, not in a separate employment contract. The parties are directed to address this issue in their briefs.

12

that § 1 "does not exclude all contracts of employment from the coverage of the FAA." *Cole*, 105 F.3d at 1467. The court relied primarily on two canons of statutory construction to reach this result. The first canon states that courts should "avoid a reading [of statutory language] which renders some words redundant." *Id.* at 1470 (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, ___, 115 S. Ct. 1061, 1069, 131 L. Ed. 2d 1 (1995)). Here, the inclusion of the terms "seamen" and "railroad employees" would be unnecessary if the exclusionary clause — "any other class of workers engaged in foreign or interstate commerce" — is read to refer to all workers whose jobs have any effect on commerce. Second, under the rule of *ejusdem generis*, "general terms which follow specific ones [are limited] to matters similar to those specified." *Id.* at 1471 (quoting *Gooch v. United States*, 297 U.S. 124, 128, 56 S. Ct. 395, 397, 80 L. Ed. 2d 522 (1936)). Thus, the general exclusionary phrase, "any other class of workers," is limited by the specific terms preceding it to mean workers in classes similar to seamen and railroad employees. *See id.*

The court also noted that every circuit court deciding the issue has found that § 1 exempts only employment contracts of workers actually engaged in the movement of goods in interstate commerce. *Id.* (citing cases from the First, Second, Third, Fifth, Sixth and Seventh Circuits). Moreover, in interpreting the phrase "a contract evidencing a transaction involving commerce" found in § 2 of the FAA, the Supreme Court contrasted § 2 with the phrase "in commerce," the precise language used in § 1. *See Allied-Bruce*

13

*Terminix Cos. v. Dobson*, 513 U.S. 265, 273, 115 S. Ct. 834, 839, 130 L. Ed. 2d 753, __ (1995). The Court stated:

> The initial interpretative question focuses upon the words "involving commerce." These words are broader than the often-found words of art "in commerce." They therefore cover more than "only persons or activities within the flow of interstate commerce.'"

*Id.* (quoting *United States v. American Bldg. Maintenance Indus.*, 422 U.S. 271, 276, 95 S. Ct. 2150, 2154, 45 L. Ed. 2d 17, __ (1974)). This analysis suggests that § 1 covers only employment contracts of workers actually engaged in the transportation of goods. *See Cole*, 105 F.3d at 1472.

The plaintiff in the present case, an employee at a convenience store located near the state line, is likely engaged in transactions "involving commerce" every day. A broad reading of § 1 would exclude the application of the FAA to this case. Yet, under *Cole*'s reading of § 1, the FAA would clearly apply. Although this court is inclined to agree with the majority view of § 1, the question has not been squarely decided by the Eleventh Circuit. Accordingly, the parties are directed to submit briefs addressing whether the plaintiff's arbitration agreement is subject to the FAA, or is excluded under § 1.

### III. CONCLUSION

An order consistent with this memorandum opinion shall be entered contemporaneously herewith. A briefing and discovery schedule are set out in the order.

DONE this __22nd__ day of September, 1997.

_____
United States District Judge